IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

DECEMBER 1997 SESSION

**FILED**

**July 29, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| APPELLEE, | ) | No. 01-C-01-9612-CC-00499 |
| | ) | |
| | ) | Williamson County |
| v. | ) | |
| | ) | Donald P. Harris, Judge |
| | ) | |
| JERRY TAYLOR, | ) | (Second Degree Murder) |
| | ) | |
| APPELLANT. | ) | |

FOR THE APPELLANT:

John H. Henderson
District Public Defender
P.O. Box 68
Franklin, TN  37065-0068

Vanessa P. Bryan
Assistant Public Defender
P.O. Box 68
Franklin, TN  37065-0068

Larry D. Drolsum
Assistant Public Defender
P.O. Box 68
Franklin, TN  37065-0068

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter
425 Fifth Avenue, North
Nashville, TN  37243-0497

Karen M. Yacuzzo
Assistant Attorney General
425 Fifth Avenue, North
Nashville, TN  37243-0497

Joseph D. Baugh
District Attorney General
P.O. Box 937
Franklin, TN  37065-0937

John W. Barringer
Assistant District Attorney General
P.O. Box 937
Franklin, TN  37065-0937

Jeff P. Burks
Assistant District Attorney General
P.O. Box 937
Franklin, TN  37065-0937

OPINION FILED:_____

AFFIRMED

Gary R. Wade, Judge

## OPINION

The defendant, Jerry Taylor, was convicted of second degree murder, a Class A felony. The trial court imposed a sentence of twenty-one years and fined the defendant $5,000.

In this appeal of right, the defendant presents four issues for review. He contends that (1) the evidence is insufficient as a matter of law to support the conviction; (2) the trial court erred by failing to grant a defense motion to suppress; (3) the jury instruction for second degree murder was incorrect and the statute is unconstitutional; and (4) the sentence is excessive.

It is the opinion of this court that the conviction and sentence should be affirmed.

The victim, Christopher Harvey, and the defendant lived together in a small trailer in the Nolensville Trailer Park in Williamson County. The victim was employed. The defendant was not. Those who knew both men testified that the two often argued over the payment of rent and food. A young neighbor in the trailer park, Cory Ford, testified that one week before the shooting, the defendant remarked that he was too old to be a match for the victim in a fight. The defendant explained that if the victim threatened him, he would "just shoot" him.

On the afternoon of November 7, 1995, the two men had been drinking. The victim became angry when Ford and a friend refused to take the defendant to buy more beer. After supper, the victim, according to the defendant, threatened the defendant with a knife and ordered him to leave the trailer. The defendant left for a time and when he came back, the victim was not there. When

the victim returned, the two men argued and the defendant claimed that the victim struck him on the arm with a .22 caliber rifle. He said the victim then slammed the rifle over a chair, breaking off the stock.

The defendant left again, walked to a nearby market to telephone a friend, and sought permission to stay overnight. When his friend failed to come by and when he saw the victim leave, the defendant returned to the trailer and lay down on the couch where he usually slept.

The victim returned and the two men argued again. The defendant claimed that the victim put a knife to the defendant's throat and told him that he had been in the Navy and that killing him would be easy. The defendant testified that he kicked the victim away into an adjoining bedroom, picked up the remains of the broken rifle, entered the bedroom, and fired the fatal shot.

The defendant explained to the investigating officer that he was "just going to try to scare" the victim or "hit him" with the rifle. He also claimed that he wanted to make sure the victim did not fall onto the knife.

In his recorded statement to police, the defendant contended that he fired the shot only after the victim, knife in hand, arose from the floor, saying: "You f----- up."

> When I shot him the first time, he said, "Jerry, No" and that was, I mean and then he got up with the knife. I mean, you know, he was on, he was done laying down. I don't know where I shot. I couldn't tell you where I shot him. How many times I shot him and he hollered, "Jerry" and that is the last thing I think he said was, "Jerry, No" and then he rolled over and was getting back up, which I knew I had shot him with a little low powered rifle. I knew I shot him low, I did aim low and when he rolled over, I knew with his temper, with the knife. I shot him again and

3

again.

The defendant contended that the rifle was old and that he did not think it would shoot.

At trial, the defendant emphasized that he followed the victim into the bedroom only to make sure the victim did not fall onto the knife. The defendant also testified that he planned to strike the victim with the rifle and that he acted in self-defense. The defendant contended that the victim was a heavy drinker and became angry when he drank. He insisted that he feared for his life. Several defense witnesses testified that the victim had a reputation for violence.

The victim was shot nine times. Two of the shots were into his back. The fatal shot entered the back, penetrated the left lung, aorta, and part of the heart. There were four gunshot wounds to the right arm and others to the left thigh and the left arm. The defendant, who placed the victim onto the bed and then went to Ford's trailer to call 911, claimed that he did not know what became of the knife after the victim was shot.

Other witnesses remember seeing the knife in the victim's hand or on the floor next to one of his hands. Cory Ford, his mother Phyllis Ford, and friend John Irwin went to the trailer with the defendant. They said they saw a knife in the victim's open hand. Phyliss Ford said the knife was in the victim's left hand. Cory Ford remembered a knife in the victim's open palm but did not say which hand. John Irwin said he saw a knife in the victim's hand but could not remember which one. Irwin said the victim was right-handed. Corporal Mark Lee said he found the knife near the victim's right hand.

When Deputy Jeff Carter arrived, he immediately took the defendant into custody, advised him of his rights, and placed him in the back of the patrol car. The defendant provided a tape-recorded statement to officers at the sheriff's office. A breathalyzer test indicated the defendant had a blood alcohol content of .07 percent. Other officers testified that the defendant admitted to shooting the victim but claimed self-defense. Several rounds of ammunition were left in the rifle.

Three bullets were found on the bed and another from inside the mattress. Four shells were located beside the bed and a fifth next to a dresser in the bedroom. Three more shells were found in the living room. A firearms expert from the Tennessee Bureau of Investigation, who examined the rifle, testified that a pull of the trigger was required for each shot. The defendant attempted to explain the presence of the shells by testifying that sometime earlier, visitors had shot the rifle inside the trailer.

I

The defendant first contends that the evidence was insufficient to support a verdict of second degree murder. He argues that the proof at trial established that he acted in self-defense because he feared death or serious bodily injury.

On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). The verdict of guilt removes the presumption of innocence and gives rise to a presumption of guilt. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). This court, in reviewing the evidence in the light most favorable to the state, concludes that a rational trier of fact could have found

5

the essential elements of second degree murder beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307 (1979); Tenn. R. App. P. 13(e).

Second degree murder requires proof that the defendant committed an unlawful, knowing killing of another. Tenn. Code Ann. §39-13-210(a)(1).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

Tenn. Code Ann. § 39-11-106(a)(20).

A person is justified in using force against another person when he or she reasonably believes (1) that death or serious bodily injury is imminent and (2) that the force used is immediately necessary to protect against the other person's use or attempted use of unlawful force. Tenn. Code Ann. § 39-11-611(a). The state has the burden of negating any defense raised by the supporting evidence beyond a reasonable doubt. Tenn. Code Ann. § 39-11-201(a)(3).

In our view, the jury could have reasonably concluded that the severity and the degree of the defendant's act were unnecessary to save his life and disproportionate to the threat presented by the victim. The defendant acknowledged following the victim, who had fallen to the floor, into the bedroom carrying a loaded rifle. He shot the victim nine times. Each shot required a separate pull of the trigger. Not all of the bullets in the rifle were fired. The victim was shot twice from behind. One of those shots caused his death.

The defendant claimed that he did not know what happened to the

6

knife. Other witnesses said the knife was in the victim's open palm or on the floor. These and other inconsistencies in the evidence were not necessarily helpful to the claim of self-defense.

We conclude that ample proof existed to allow a rational trier of fact to conclude that the defendant unlawfully and intentionally killed the victim. The jury acted within its prerogative in rejecting the self-defense claim or in refusing to consider lesser offenses.

II

Before trial, the defendant filed a motion to suppress the statement he made to the police.[1] On March 22, 1996, the trial court conducted a suppression hearing to determine the admissibility of statements the defendant made at the scene of the crime on the night of the shooting. The defendant contends that the statements were elicited in violation of his rights under the United States and Tennessee Constitutions. He claims that because he was intoxicated and in shock, he never voluntarily waived his right to remain silent.

The defendant did not testify at the suppression hearing. Deputy Jeff Carter testified that after receiving the report of the shooting, he went to the trailer park. He stated that the defendant, who was leaving the trailer when Carter arrived, was taken into custody and placed into the patrol car. "He was talking the whole time this was going on. And I walked him back to my patrol car. At that point I sat him down . . . I had him listen and I gave the Miranda warning to him." Carter acknowledged that the defendant smelled of alcohol, that his speech was "thick

---

[1]The defendant originally attempted to suppress a tape-recorded statement he gave to the authorities at 1:15 A.M. on November 8, 1995, but withdrew the motion at the March 22, 1996, suppression hearing; however, the defendant continued to object to officers' recollections of statements he purportedly made at the scene of the shooting.

7

tongued," and that he talked a lot. Deputy Carter said that the defendant was cooperative and stopped talking during the Miranda warning. "He even replied that he understood them after I was finished." Deputy Carter testified that he did not question the defendant at that time, choosing instead to process the crime scene.

Corporal Mark Lee arrived as the defendant was being placed into the car. Lee also went into the trailer and later entered Deputy Carter's patrol car to use the phone. Lee testified that he did not question the defendant but was aware that Deputy Carter had Mirandized the defendant. Lee recalled that the defendant volunteered his version of the altercation. He said that the defendant claimed the victim broke the butt of a rifle over his back and then threatened him with a knife. "He volunteered he had shot him.... He said, 'I shot him, what else could I do? You know he had a knife and he was waving the knife in my face.'" Lee described the defendant as smelling of alcohol, as talking excitedly, and as trying to cooperate with the investigation.

After sitting in the patrol car for approximately one hour, the defendant was taken to the trailer to use the bathroom and to speak with the detectives. At that point, Deputy Carter recalled that Detective Beard asked if Miranda warnings had been provided. Detective Beard revealed that the defendant had no trouble walking up the stairs to the trailer and reenacted the events leading to the shooting. Detective Beard remembered the defendant's claim that he left the trailer after the victim had threatened him with a knife and that when he returned, the victim struck him with a rifle and broke the rifle over a chair. He recalled the defendant saying that he left a second time and returned later when the victim was gone; and that when the victim returned and threatened him with a knife, he pushed the victim away, grabbed the remains of the rifle, followed him into the bedroom, and fired one

8

shot. He recalled the defendant's claim that he fired the weapon only after the victim advanced toward him. Eight more shots followed.

The breathalyzer test indicated a blood alcohol level of .07 percent at 12:50 A.M. Detective Beard testified that twenty-five minutes later, the defendant received Miranda warnings, signed a waiver, and gave a tape-recorded interview. Detective Beard described the defendant as a fairly educated man, having been a former bar manager and as having some common sense.

The trial court initially determined that the defendant's pre-trial statements were knowingly and voluntarily made. State v. Pursley, 550 S.W.2d 949, 950 (Tenn. 1977). When the trial court makes findings of fact at the conclusion of a suppression hearing, the facts are accorded the weight of the jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). These facts are binding upon this court unless the evidence in the record preponderates against the findings of the trial court. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also Stephenson, 878 S.W.2d at 544.

Questions of credibility of witnesses, the weight and value of the evidence and the resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. Odom, 928 S.W.2d at 23.

The state relies upon this Court's opinion in State v. Jack Jay North,

9

Hardin County No. 02-C-01-9512-CC-00369 (Tenn. Crim. App., Jackson, December 12, 1996), app. denied (Tenn., July 7, 1997). North was arrested for driving under the influence following an accident. He became a suspect in a murder and was questioned by authorities. He claimed that he did not voluntarily waive his rights because he was intoxicated, injured, medicated, sleepy, hungry, and cold at the time of his statements. As in this case, the trial court in North found the defendant had knowingly and voluntarily waived his constitutional rights. On direct appeal, this court agreed.

In our view, the defendant's constitutional rights were not violated. The evidence supports the trial court's conclusion. Moreover, the statements at issue are largely self-serving and were consistent with the defense offered at trial. There was no prejudicial error by the admission of the statements.

III

As his third issue, the defendant challenges the trial court's instructions to the jury as to second degree murder, voluntary manslaughter, and provocation. The defendant also contends the second degree murder statute is unconstitutional.

During the course of the trial, the trial judge observed that the pattern jury instructions for second degree murder did not address "heat of passion brought on by adequate provocation." In consequence, the trial judge advised the jury that a killing committed in a heat of passion did not rise to second degree murder. The trial court instructed the jury as follows:

> Any person who commits second degree murder is guilty
> of a crime. For you to find the defendant guilty of this
> offense, the state must have proven beyond a
> reasonable doubt the existence of the following essential
> elements:
> (1) that the defendant unlawfully killed the

10

alleged victim;

(2) that the defendant acted intentionally or knowingly; and

(3) <u>that the killing did not result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.</u>

The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. Bear in mind that if you find a knowing killing with adequate provocation, that is voluntary manslaughter.

If you find beyond a reasonable doubt the defendant is guilty of this offense, you will convict him and your verdict will be, "We the Jury find beyond a reasonable doubt the defendant is guilty of murder in the second degree." If this is your verdict, you may also assess a fine in some amount not to exceed $50,000.00 Such fine would be in addition to any other punishment provided by law and must be reported with your verdict if you find it warranted.

If you find the defendant not guilty of this offense or if you have a reasonable doubt as to his guilt, you will acquit him and you must then proceed to consider the defendant's guilt or innocence of the offense of voluntary manslaughter which is a lesser included offense.

(Emphasis added). The trial judge then instructed fully on voluntary manslaughter, criminally negligent homicide, and self-defense.

Initially, defense counsel expressed satisfaction with the trial judge's instructions. There was no objection either before or after the charge to the jury. The defendant did not contest the jury charge in his motion for new trial although he did attack the constitutionality of the second degree murder statute.

The defendant also characterizes the third issue as "whether the trial court erred in failing to declare the second degree murder statute unconstitutional." He cites several reasons for his claim. The defendant argues that the statute is vague and over broad. <u>See</u> U. S. Const. amend. V, XIV. He contends a violation of

11

the Sixth Amendment to the U.S. Constitution, requiring that the defendant be "informed of the nature and cause of the accusations," and Article 9 of the Tennessee Constitution, "to demand the nature and cause of the accusation." He also asserts that the "patchwork" instructions on second degree murder, which were not objected to at trial, qualify as plain error. The defendant attacks Tenn. Code Ann. § 39-13-210, the second degree murder statute, for failing to properly differentiate the varying degrees of homicide. He contends that the murder statutes are "so conflicted" that the trial judge had to give supplemental instructions in order for the jury to properly consider the charges. He argues that this raises a question as to "whether the jury verdict was unanimous considering the 'combined charge.'"

Furthermore, the defendant challenges the statute on equal protection grounds, arguing the legislature has failed to differentiate between second degree murder and other homicide statutes. The defendant reasons that "since the second degree murder statute did not address the elements of voluntary manslaughter, the state was remiss in not electing one statute or the other. By failing to elect, the conviction in this cause violates the Fourteenth Amendment."

Finally, the defendant objects to the jury instructions requiring consideration of the second degree charge first and, thereafter, in order, the lesser offenses. He makes the following argument:

> If the jury rejects that the killing of another in a state of passion produced by adequate provocation, the verdict automatically becomes "Second Degree Murder," there is no consideration for criminally negligent homicide and little emphasis is placed on self-defense. When the jury was given a pieced together charge . . . there becomes a question whether their verdict was unanimous.

The defendant contends the jury was not allowed to consider state of passion or adequate provocation.

12

It is rare for this court to have the opportunity to review so many issues, constitutional and otherwise, in a single allegation of error. Nevertheless, we will attempt to address the questions presented.

## (A)

Generally, the failure to raise an issue in motion for new trial results in waiver. Tennessee Rule of Appellate Procedure 3(e) provides that for appeals "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions, granted or refused ... or other grounds upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived."

This rule embodies the common law practice of Tennessee, under which an objection to a particular jury instruction is deemed waived in the absence of contemporaneous objection unless the instruction contains plain error. See e.g., Davis v. State, 793 S.W.2d 650, 651 (Tenn. Crim. App. 1990); State v. Cravens, 764 S.W.2d 754, 756-57 (Tenn. 1989). The defendant in this case did not make a contemporaneous objection to the court's charge. Further, he did not raise the issue of an improper jury instruction in his motion for a new trial. Clearly waiver would preclude a portion of the claims raised. Because, however, the defendant alleges plain error, we must at least address whether we can consider the merits of the issue.

## (B)

Before an error may be recognized pursuant to Tenn. R. Crim. P. 52(b), the error must be "plain" and it must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious."

13

United States v. Olano, 507 U.S. 725, 732 (1993). A "substantial right" is a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and is constitutional in nature." State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). A plain error is not merely error that is conspicuous. Plain error is especially egregious error that strikes at the "fairness, integrity or public reputation of judicial proceedings." See State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App.), app. denied (Tenn. 1983).

The jury instruction in this case informed the jury that second degree murder is a knowing killing. The trial judge added that if the jury found the killing was brought about by provocation, the offense would be voluntary manslaughter. The jury was made aware of the differences between second degree murder and voluntary manslaughter. The addition to the instruction made by the trial judge was to the defendant's favor. Because the defendant could not have been harmed by the trial judge's amendments to the pattern instruction, there was no reversible error, plain or otherwise.

The challenges to the instructions are without merit.

(C)

The gravamen of the defendant's constitutional claim is that the second degree murder statute violates due process and equal protection. It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). The fair warning requirement embodied in the due process clause prohibits the states from holding an individual criminally responsible for conduct which he could not have reasonably understood to be proscribed. United States v. Harriss,

14

347 U.S. 612, 617 (1954). Due process requires that the law give sufficient warning so that people may avoid conduct which is forbidden. Rose v. Locke, 423 U.S. 48, 49-50 (1975). The words of a statute are to be taken in their natural and ordinary sense without a forced construction to limit or extend their meaning. Ellenburg v. State, 384 S.W.2d 29, 30 (Tenn. 1964). Initially, trial courts are charged with upholding the constitutionality of statutes where possible. Dykes v. Hamilton County, 191 S.W.2d 155, 159 (Tenn. 1945); State v. Joyner, 759 S.W.2d 422, 425 (Tenn. Crim. App. 1987). The constitutional test for vagueness is whether a statute's prohibitions are not clearly defined and are thus susceptible to different interpretations as to what conduct the statute actually proscribes. State v. Forbes, 918 S.W.2d 431, 447-48 (Tenn. Crim. App. 1995); see Grayned v. City of Rockford, 408 U.S. at 108; Baggett v. Bullitt, 377 U.S. 360, 367 (1964).

In contrast, the constitutional test for overbreadth is whether the statute's language overreaches unlawful conduct and encompasses activity that is constitutionally protected. Forbes, 918 S.W.2d at 448; Grayned, 408 U.S. at 114-15. Under our principles of due process, an over broad or vague statute is vulnerable to a constitutional challenge because it (1) fails to provide fair notice that certain activities are unlawful; and (2) fails to establish reasonably clear guidelines for law enforcement officials and courts, which in turn invites arbitrary and discriminatory enforcement. Forbes, 918 S.W.2d 448; see Rose v. Locke, 423 U.S. at 49-50; Smith v. Goguen, 415 U.S. 566, 572-73 (1974). In our view, the words of Tenn. Code Ann. § 39-13-210 are sufficiently precise to put an individual on notice of prohibited activities. The language sets out boundaries sufficiently distinct for the courts to fairly administer the law. See State v. Thomas, 635 S.W.2d 114, 116 (Tenn. 1982).

15

The defendant also challenges the second degree murder statute on equal protection grounds. He asserts that the legislature has failed to differentiate between second degree murder and other homicide statutes.

Second degree murder is the only homicide offense defined in Tenn. Code Ann. § 39-13-210. Killing in the heat of passion after provocation is addressed in the voluntary manslaughter charge codified at Tenn. Code Ann. § 39-13-211. Criminally negligent homicide is defined in Tenn. Code Ann. § 39-13-212. Here, the evidence supports a finding that the defendant committed "a knowing killing" after following the victim into his bedroom and shooting the victim nine times. The fatal shot hit the victim from behind. This conduct falls within the conduct proscribed by the second degree murder statute. The jury was aware of the varying degrees of offenses based upon the trial court's instructions and the arguments made by counsel. The jury simply found the evidence supported the greater charge.

Even if these statutes were overlapping, there is no constitutional violation. In United States v. Batchelder, 442 U.S. 114, 123-24 (1979), when faced with a similar challenge to two federal statutes, the court ruled that when an act violates more than one criminal statute, the government may prosecute under either, so long as it does not discriminate against any class of defendants. The decision to prosecute and what charge to bring before a grand jury are decisions that generally rest in the prosecutor's discretion. Id., 442 U.S. at 123-24. Because the conduct of the defendant clearly caused the death of the victim, there is no equal protection violation.

(D)

The defendant objects to the sequence of the jury charge which first

16

defined second degree murder and then proceeded to define voluntary manslaughter and criminally negligent homicide. Sequential jury instructions such as these have been upheld by this court on a number of occasions. See State v. Raines, 882 S.W.2d 376, 381-82 (Tenn. Crim. App.), app. denied (Tenn. 1994); State v. McPherson, 882 S.W.2d 365, 375-76 (Tenn. Crim. App.), app. denied (Tenn. 1994); State v. Rutherford, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993), app. denied (Tenn. 1994).

The jury was given instructions on second degree murder as well as the lesser crimes of voluntary manslaughter and criminally negligent homicide. The jury knew there were several options available. Under our law, it is presumed that juries follow the instructions of the trial judge. State v. Laney, 654 S.W.2d 383, 389 (Tenn.), cert. denied, 464 U.S. 1003 (1983).

(E)

The defendant claims that the jury was not allowed to consider state of passion or adequate provocation. There is simply nothing in the record to support this allegation. The record clearly demonstrates that the judge instructed the jury on lack of passion and provocation as part of second degree murder. The jury is presumed to follow the instructions given. Laney, 654 S.W.2d at 389. This issue is without merit.

(F)

The defendant argues that the state failed to make an election of offenses. Election was not required in this case. See State v. Shelton, 851 S.W.2d 134 (Tenn. 1993). The defendant did not deny shooting the victim on Nov. 7, 1995. The only question for the jury was whether the shooting was a knowing killing

17

(second degree murder), a killing in a state of passion (voluntary manslaughter) or a killing which was the result of criminally negligent conduct (criminally negligent homicide). There was only one incident. It was for the jury to determine the gravity of the offense. There was no risk of a non-unanimous verdict since jurors were deciding only one of three possible crimes. The jury found the defendant guilty of second degree murder, concluding there was either no provocation or inadequate provocation to warrant voluntary manslaughter. In our view, there was no risk of a "patchwork verdict."

In summary, we find no merit to any of the claims embodied in the third issue.

IV

As his final issue, the defendant complains that his twenty-one-year sentence was excessive. He argues that the trial court erred (a) by failing to consider two mitigating factors and (b) by improperly weighing the mitigating and enhancing factors present.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

18

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

At the time of the offense, the presumptive sentence for a Class A felony was the midpoint of the range if there were no enhancement and mitigating factors. Tenn. Code Ann. § 40-35-210(c). Should the trial court find mitigating and enhancement factors, it must start at the middle of the range, enhance the sentence based upon any applicable enhancement factors, and then reduce the sentence based upon any appropriate mitigating factors. Tenn. Code Ann. § 40-35-210(e). The weight given to each factor is discretionary with the trial court so long as the record supports its findings and it complies with the 1989 Sentencing Act. See Ashby, 823 S.W.2d at 169. The trial court must, however, make specific findings on the record which indicate its application of the sentencing principles. Tenn. Code Ann. §§ 40-35-209, -210.

The presentence report established that the defendant, age forty-four at the time of the sentencing hearing, completed the ninth grade. He had worked as a truck driver and manager of a business but was unemployed at the time of the shooting. He has three children. His prior criminal history includes convictions for breach of the peace, assault, receiving stolen property and two convictions for driving under the influence. He was on judicial diversion for a charge of theft over $10,000 when the shooting occurred. He was also on probation for DUI when the

19

shooting occurred.

The trial court found the following enhancement factors applicable:

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(1).

(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community. Tenn. Code Ann. § 40-35-114 (8).

The trial court found the following mitigating factors applicable:

(2) The defendant acted under strong provocation. Tenn. Code Ann. § 40-35-113(2).

(3) Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense. Tenn. Code Ann. § 40-35-113(3).

The defendant concedes the presence of enhancement factors (1) and (8) and yet contends that he lacked a sustained intent to violate the law, Tenn. Code Ann. § 40-35-113(11), and that he acted under duress or domination of another person, Tenn. Code Ann. § 40-35-113(12).

The defendant told a neighbor a week before the shooting that he was too old to fight the victim and that he would shoot the victim if threatened. After successfully pushing the victim away on the night of the shooting, the defendant followed the victim into the bedroom, taking a loaded rifle with him. He testified that he planned to hit the victim with the rifle. Instead, the defendant shot the victim nine times. The defendant testified that he continued to shoot the victim even after the victim pleaded, "Jerry, No." All of this supports the trial court's rejection of Tenn. Code Ann. § 40-35-113(11). State v. Johnson, 909 S.W.2d 461, 465 (Tenn. Crim. App.), app. denied (Tenn. 1995).

20

Section 40-35-113(12) of Tenn. Code Ann. provides as follows: "The defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime." Duress is defined as a threat of "such a character as to overcome the mind and will and destroy the free agency of a person of ordinary firmness." Johnson v. Roland, 61 Tenn. (2 Baxt.) 203, 206 (1872). The defendant testified that he twice left the trailer after threats made by the victim. During the third confrontation, the defendant had the opportunity to leave again, but he did not. In our view, there was evidence to support the trial court's rejection of the defendant's claim that he acted under "duress or domination." State v. John D. Joslin, Knox County No. 03-C-01-9510-CR-00299 (Tenn. Crim. App. Knoxville, September 18, 1997). No one forced the defendant to fire the first shot or any of the several shots thereafter.

The defendant was eligible for a sentence ranging from fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1). The judge started at the mid-range of twenty years, determined that the enhancing factors slightly outweighed the mitigating factors, and added one year. That the defendant had previous convictions and was serving probation and judicial diversion when he shot the victim warranted significant weight.

Accordingly, the judgment is affirmed.

_____
Gary R. Wade, Judge

21

CONCUR:

_____
Joseph M. Tipton, Judge


_____
Curwood Witt, Judge